UNITED STATES OF AMERICA
MERIT SYSTEMS PROTECTION BOARD
2015 MSPB 7

Docket No. DA-0752-13-0313-I-1

**Ty K. Sanders,**

**Appellant,**

**v.**

**Department of Homeland Security,**

**Agency.**

January 15, 2015

Ty K. Sanders, Cedar Key, Florida, pro se.

Lisa M. Ezra, Laredo, Texas, for the agency.

**BEFORE**

Susan Tsui Grundmann, Chairman
Anne M. Wagner, Vice Chairman
Mark A. Robbins, Member

## OPINION AND ORDER

¶1      The agency has petitioned for review of an initial decision that reversed its action removing the appellant for inability to perform the essential duties of his position.  For the reasons discussed below, we AFFIRM the initial decision insofar as it found that the appellant failed to prove his affirmative defense of reprisal for protected equal employment opportunity (EEO) activity and REVERSE it insofar as it reversed the agency's removal action.  We find that the agency proved by preponderant evidence that the appellant was unable to perform

the essential duties of his position and that his removal promotes the efficiency of the service.

## BACKGROUND

¶2      The appellant was a Customs and Border Protection Officer (CBPO). Following an incident at work on August 3, 2011, the agency rescinded the appellant's authority to carry a firearm and ordered him to undergo physical and psychiatric fitness-for-duty evaluations. Initial Appeal File (IAF), Tab 16 at 283-84, 290, 293-94, 297.[1] The appellant was examined by Dr. Brian Skop, who is certified in general and forensic psychiatry. Hearing Transcript (HT) at 8-9. Dr. Skop conducted a general medical and mental health history with the appellant and asked him questions about the events he believed precipitated the fitness-for-duty evaluation. *Id.* at 13. Dr. Skop observed the appellant's behavior through cognitive testing and conducted psychological testing using the Minnesota Multiphasic Personality Inventory (MMPI) 2, a standard psychological test that looks for significant mental health issues and personality styles. *Id.* at 13-14. Dr. Skop concluded that the appellant was unable to work in a stressful law enforcement environment and that he was not fit for duty. *Id.* at 26-27. Dr. Paul Prunier, a consulting psychiatrist for the agency, reviewed Dr. Skop's report and its supporting medical documentation and several memoranda and

---

[1] According to the agency, the appellant approached his and another supervisor on August 3, questioned them about why they did not enforce all federal and state laws, and demanded that they provide him with a written list of the laws he should enforce. IAF, Tab 16 at 283, Tab 7 at 4. Both supervisors indicated that the appellant was visibly upset. IAF, Tab 7 at 4. A few minutes later, the appellant returned with a detainee and began to ask questions of one of the supervisors. The supervisor provided guidance, and the appellant responded by asking, "Should I shoot him first . . . ?" *Id.* In a previous incident on May 18, 2011, when the appellant's supervisor addressed the significance of professionalism when interacting with the general public in the course of a mid-year performance review, the appellant stated that he was a "target" for the traveling public because of his race and ethnicity and added: "I am willing to take on the entire Mexican army by myself, but unable to take on both sides alone." *Id.*

emails concerning the appellant's behavior. HT at 143, 147-50; IAF, Tab 16 at 281-87. Dr. Prunier, who also has significant experience assessing agency employees, reached the same conclusion as Dr. Skop—that the appellant was not fit for duty. HT at 145-46; IAF, Tab 7 at 18-19.

¶3 The agency proposed the appellant's removal based on a charge of inability to perform the essential duties of his position, and a decision was issued on June 4, 2012, sustaining the removal effective the following day. IAF, Tab 7 at 4-7; Tab 8 at 13-16.[2] While the subsequent appeal was pending in the Board's Dallas Regional Office, the appellant was examined by Dr. Michael Gower and Dr. Tonia Werner, forensic psychiatrists at the University of Florida. IAF, Tab 31. In their August 2013 report, they provided a brief summary of the documents they reviewed, including, among other things, Dr. Skop's psychiatric evaluation of the appellant, Dr. Prunier's psychiatric consultant report, the appellant's position description, emails and letters regarding the appellant's conduct on August 3, 2011, and information from two of the appellant's mental health providers dated November 27, 2011, and March 1, 2012. *See id.* Drs. Gower and Werner found that the appellant did not suffer from any diagnosable mental illness and that he was fit for duty. *Id.* at 17, 19.

¶4 After conducting a hearing, the administrative judge found, among other things, that the "new medical evidence shows that the appellant has recovered from the condition that previously prevented him from performing the duties of his position" and reversed the removal action on that basis. IAF, Tab 34, Initial Decision (ID) at 8-9. In so finding, the administrative judge credited the University of Florida report over the testimony of Dr. Prunier, concluding that there "is no objective, identifiable basis that would, in this instance, entitle

---

[2] The agency's proposal notice cited five workplace incidents, in addition to the May 18 and August 3, 2011 incidents, which it found to indicate rude and unprofessional behavior. IAF, Tab 7 at 4.

Prunier's opinion to more weight than the opinion of Werner at the University of Florida." ID at 7. The administrative judge further found that the appellant failed to prove his affirmative defense that the removal action was reprisal for protected EEO activity. ID at 8-9.

¶5 The agency has filed a timely petition for review in which it asks the Board to sustain its removal action. Petition for Review (PFR) File, Tab 1. The appellant filed a timely response and also filed what he styled as a "petition for enforcement" regarding the agency's alleged failure to provide interim relief as ordered in the initial decision.[3] PFR File, Tabs 3-4.

## ANALYSIS

The agency complied with its interim relief obligations.

¶6 When an initial decision provides an appellant with interim relief, an agency's petition for review must be accompanied by a certification that the agency has complied with the interim relief order, either by returning the appellant to duty or by making a determination that the appellant's return to duty would be unduly disruptive. 5 U.S.C. § 7701(b)(2)(A); 5 C.F.R. § 1201.116(a); *see Hodges v. Department of Justice*, 121 M.S.P.R. 337, ¶ 17 (2014); *see also Lavette v. U.S. Postal Service*, 96 M.S.P.R. 239, ¶ 12 (2004). If an agency fails to provide the required certification with its petition for review, the Board may dismiss the agency's petition on that basis; however, it is not required to do so. *Hodges*, 121 M.S.P.R. 337, ¶ 17; *see* 5 C.F.R. § 1201.116(e).

¶7 The September 13, 2013 initial decision in this appeal ordered that, in the event that a petition for review was filed, the agency was to provide the appellant

---

[3] The appellant also asked the Board to dismiss the agency's petition for review as untimely filed. PFR File, Tab 3. Although the original filing deadline was October 18, 2013, this was extended by 16 days, until Monday, November 4, because of the government-wide shutdown. Accordingly, the agency's November 4 petition for review filing was timely filed.

interim relief in accordance with 5 U.S.C. § 7701(b)(2)(A), effective the date of the initial decision and continuing until the Board issued a final decision in the appeal. ID at 10-11. The agency submitted an interim relief certification with its petition for review, in which the Director of Field Operations for the appellant's work station submitted a Standard Form 52 showing that the appellant would be restored to a pay and benefit status as ordered in the initial decision. PFR File, Tab 1 at 29-31. The Director stated that he had determined not to return the appellant to work during the pendency of the appeal on the ground that his presence would be unduly disruptive. *Id.* at 29. About 6 weeks after this certification, the appellant filed what he styled as a petition for enforcement of the interim relief order in which he said he had not yet received any interim relief pay or benefits. PFR File, Tab 4. In its responsive pleading, the agency described delays in processing the appellant's pay and benefits but presented evidence that it had started processing back pay and benefits starting from August 9, 2013. PFR File, Tab 5 at 6, 34, 47. In his amended petition for enforcement, the appellant conceded that he had been provided interim relief pay and benefits from August 9, 2013, forward, but argued that he was due back pay from June 5, 2012, the effective date of his removal. PFR File, Tab 6.

¶8    The statute provides for the award of interim relief "effective upon the making of the [initial] decision, and remaining in effect pending the outcome of any petition for review . . . ." 5 U.S.C. § 7701(b)(2)(A). Accordingly, the agency was required to provide pay and benefits starting on September 13, 2013, the date on which the initial decision was issued.[4] As there does not appear to be

---

[4] The agency commenced the provision of interim relief effective August 9, 2013, approximately a month earlier than required by the initial decision. PFR File, Tab 1 at 29, Tab 5 at 34. We assign no significance to this error. *See Lavette*, 96 M.S.P.R. 239, ¶ 14 (declining to dismiss a petition for review where the agency exceeded the relief ordered by the initial decision); *see also Hardison v. Department of the Navy*, 103 M.S.P.R. 147 (2006) (same).

any dispute that the agency has provided the required interim relief, we deny the appellant's request for relief in this regard.[5]  Because the agency has provided the required interim relief, we will consider the agency's arguments regarding its removal action.

The Board will consider post-removal medical evidence that is probative of whether, during the pendency of the Board appeal, the appellant continues to suffer from a medical condition that prevents him from performing the essential functions of his position.

¶9      In reversing the removal action on the ground that new medical evidence showed that the appellant was able to perform the duties of his position, the administrative judge relied on a line of precedent that began with *Street v. Department of the Army*, 23 M.S.P.R. 335 (1984).  ID at 2-3.  These cases hold that, even where an agency proves by preponderant evidence that the appellant was unable for medical reasons to perform the duties of his position when he was removed, the removal action will be reversed on the basis that such action does not promote the efficiency of the service if, during the pendency of the Board appeal, the appellant presents new medical evidence showing that he has recovered such that he is able to perform the essential duties of his position.  *See, e.g.*, *Johnson v. U.S. Postal Service*, 120 M.S.P.R. 87, ¶ 8 (2013); *Morgan v. U.S. Postal Service*, 48 M.S.P.R. 607, 610-13 (1991); *Street*, 23 M.S.P.R. at 340-43.[6]  In a recent case, the Board stated that this line of precedent applies "where the

---

[5] The Board's regulations do not provide for petitions for enforcement of interim relief orders; such petitions apply only to final Board decisions.  5 C.F.R. § 1201.182(a).  The Board's regulations do allow an appellant to challenge an agency's certification that it has provided interim relief.  5 C.F.R. § 1201.116(b).  We have therefore considered the appellant's pleadings in this regard under section 1201.116.

[6] The agency argues that the *Street/Morgan* line of cases should not be applied to agency removal actions based on psychiatric reasons because psychiatric assessments are less definitive.  PFR File, Tab 1 at 20-21.  The agency cites nothing to support its theory that actions based on psychiatric conditions should be viewed differently, and we discern no reason to do so.

evidence clearly and unambiguously demonstrates that the appellant has recovered during the pendency of a Board appeal such that he is able to perform the essential duties of his position." *Wren v. Department of the Army*, 121 M.S.P.R. 28, ¶ 6 (2014). The Board noted that this line of precedent was consistent with a then-recent decision by our reviewing court in which the court ruled that the Board must consider new, post-removal evidence in mitigation of the penalty that was not before the deciding official. *Id.*, ¶ 8 (citing *Norris v. Securities & Exchange Commission*, 675 F.3d 1349 (Fed. Cir. 2012)).

¶10    This case is not on all fours with the *Street*/*Morgan* line of precedent in that the post-removal medical report issued by Drs. Gower and Werner does not "clearly and unambiguously" find that the appellant recovered from the psychiatric conditions noted in the original reports issued by Drs. Skop and Prunier. *See Wren*, 121 M.S.P.R. 28, ¶ 6. It does, however, indicate that at the time of Drs. Gower and Werner's August 2013 assessment of the appellant, he did not suffer a psychiatric condition, including those identified in Drs. Skop's and Prunier's assessment. Because this is probative, but not necessarily dispositive, evidence of whether the appellant currently suffers from a psychiatric condition, we conclude that the *Street/Morgan* doctrine applies and the evidence should be considered.

The agency proved by preponderant evidence that the appellant was unable to perform the essential duties of his position.

¶11    The administrative judge did not cite any particular legal standard or test for determining whether the agency proved its charge that the appellant was unable to perform the essential duties of his position. The Board has held, however, that where an employee occupies a position with medical standards or physical requirements and the finding that he was unable to perform was based on medical history, the agency is required to show the following in order to establish a charge of physical inability to perform: (1) the disabling condition itself is disqualifying; (2) its recurrence cannot be ruled out; and (3) the duties of the

position are such that a recurrence would pose a reasonable probability of substantial harm. *Brown v. Department of the Interior*, 121 M.S.P.R. 205, ¶ 8 (2014); *see* 5 C.F.R. § 339.206. The appellant's CBPO position had physical requirements, and thus the standard set forth above is applicable. IAF, Tab 16 at 180-83.

¶12    Doctors Skop and Prunier presented a consistent and persuasive account for their conclusion that the appellant was not currently fit for duty. Dr. Skop diagnosed the appellant as having symptoms of an adjustment disorder with anxiety, found that he had narcissistic and obsessive/compulsive personality traits, and determined that there were indicators of possible substance abuse. HT at 21-22. Dr. Skop explained these diagnoses and how they were affecting the appellant's ability to perform the duties of his position as follows:

> [A]n adjustment disorder is a maladaptive reaction to stress and (indiscernible) that might lead to . . . increased acting out behaviors, such as some of the sarcasm that isn't perhaps merited in some of the memorandum. It appears it probably led him to get a prescription for Valium, which is an anxiolytic that can impact a person's ability to perform their [sic] duties. So those are the main ways that I was concerned.
>
> . . .
>
> [I]t appeared to me, through reading the memorandum and through the psychological testing, that he was prone to get angry quickly, that he maybe was not very flexible with working with others, and that that would impair his duty performance.

*Id.* at 22-23.

¶13    Regarding the results of the MMPI-2 psychological test, Dr. Skop testified that the appellant was "somewhat guarded and defensive, that he is emotional—out of control and was notable for being excitable, that impulse control can be a problem. He can be quick tempered, and he had a history of angry acting out." HT at 23. Dr. Skop testified that he was particularly "worried about the poor anger modulation, difficulty working with others, interfering with the teamwork that is necessary to effectively carry out law enforcement duties." *Id.* at 24-25.

Regarding the appellant's ability to carry a government-issued firearm, Dr. Skop testified that:

> I had concerns about that, as well as the psychological testing that I was reflecting him having a quick temper. And agitating people that were crossing as civilians, as well as coworkers, I thought that that might potentially lead to escalation of the situation that might, you know, lead to imprudence with him potentially.

HT at 25.

¶14    In addition, the record shows that the appellant was prescribed controlled substances, including Hydrocodone and Diazepam. IAF, Tab 31 at 12-13. He also drinks three to four glasses of wine 4 to 5 days a week. *Id*. at 14. The record further shows that CBPOs are required, as a condition of their employment, to work unscheduled work hours or overtime. HT at 42 (testimony of deciding official); IAF, Tab 16 at 182 ("The essential duties and tasks are performed indoors and outdoors throughout the day and night"; "Due to the unique function of the job, the Officer may work extended or unscheduled hours.").

¶15    Dr. Skop testified that the appellant's drinking and use of prescription medication would interfere with the requirement that he work unscheduled hours or overtime:

> A. I had concerns about that based on the medications he was on and his drinking, drinking two to three drinks per night, and also intermittently taking Valium and [H]ydrocodone, both of which are sedatives.
>
> Q. And why would that prevent him from performing unscheduled work or overtime?
>
> A. Well, basically, if there was an emergency or they needed to call him in in the middle of the night, he would be under the influence of these drugs. It would slow his reaction time down, make it difficult for him to safely operate a vehicle, or, you know, typical with alcohol intoxication (indiscernible) where people don't necessarily use the restraint that they would have when sober.

HT at 26.

¶16 After reviewing the same materials as Dr. Skop, Dr. Prunier reached very similar conclusions. Regarding the results of the MMPI-2 psychological testing, he testified as follows:

> Mr. Sanders was somewhat guarded and defensive, and portrayed himself as functioning at an excellent level, because he's minimizing problems or trying to manage impressions. That he reported that he has used alcohol excessively. And, in addition, for a number of other statements in that section, including difficulties with impulse control, where Dr. Frederick says that the testing indicated that impulse control can be a problem, that Mr. Sanders is quick tempered, and he has a history of angry acting-out, that he has angry responses to perceived slights, and that he has a history of acting out against authority, that he is easily annoyed. And most importantly, that he is likely to continue to demonstrate the same level of impulsiveness as he has in recent years.

HT at 156. Emphasizing that the duties of a CBPO are "very demanding and stressful," Dr. Prunier testified that:

> It's a weapon-carrying position that requires somebody to be on task and on target at all times, to be under good emotional control and to be stable. Because the hours are long and unpredictable, and people are working in hazardous positions, it further exacerbates the difficulty of performing these kind of duties. And in addition, the position requires, really, that an individual be able to work very closely with others and make the risk-assessment decisions quickly and accurately.
>
> The various things that Dr. Frederick noted in the MMPI-2 data, along with the data that Dr. Skop determined in the process of his evaluation, in my mind indicated that Mr. Sanders is unable to perform the duties of that position in the manner that I described.

*Id.* at 157. Dr. Prunier also expressed concern about the appellant's alcohol use.[7] *Id.* at 169-71.

---

[7] The administrative judge stated that he "must discount [Dr.] Prunier's assessment because, at least in his hearing testimony, he presented conflicting opinions about the appellant . . . . He testified that the appellant's inability to control his anger can make him violent, and this is an imminent risk of danger to himself or others . . . . Later in his testimony, he stated that the appellant's 'unfitness' was not based on a propensity to

¶17        As discussed above, Drs. Gower and Werner examined the appellant in August 2013, and found that he did not suffer from a psychiatric condition. Their professional assessment is worthy of consideration but must be viewed in light of the fact that, although they were provided the position description for the CBPO position, there is no indication in the record that they were experienced in assessing law enforcement officers in general or CBPOs in particular. In contrast, Dr. Skop and Dr. Prunier each had a great deal of experience evaluating applicants for and employees in the CBPO position. In fact, Dr. Skop has performed 30 to 40 fitness-for-duty examinations for Customs and Border Protection. HT at 11. Likewise, Dr. Prunier has completed about 8,000 preemployment fitness-for-duty consultations and 750 to 800 fitness-for-duty consultations on current employees at Customs and Border Protection. *Id.* at 146. They are thus intimately familiar with the essential duties of the CBPO position.

¶18        In addition to Drs. Skop's and Prunier's greater experience in assessing the psychiatric conditions of CBPOs, we note that the University of Florida doctors did not address Drs. Skop's and Prunier's concerns about the effect of the appellant's alcohol and prescription drug use on his ability perform his duties. This omission is significant because of the legitimate concern that, because of his alcohol and prescription drug use, the appellant would be unable to comply with the requirement that he be available to work unscheduled hours during an emergency or in the middle of the night.[8]

---

violence and that the appellant is not an immediate risk to himself or others." ID at 7. We have reviewed Dr. Prunier's testimony in its entirety. At no point did he testify or suggest that the appellant posed an imminent risk of danger to himself or others. *See* HT at 141-206. Dr. Prunier acknowledged Dr. Skop's opinion that the appellant's immediate risk of danger to himself or others was low, but not nonexistent, and added that his imbibing alcohol and taking prescription medication would exacerbate the risk. *Id*. at 157-60. Thus, we discern no basis to discount Dr. Prunier's testimony.

[8] The Special Panel has recently ruled that, for purposes of determining whether an agency has failed to accommodate a disability as required under the Rehabilitation Act, working substantial overtime and/or the graveyard shift are not "essential functions" of

¶19    In sum, while Drs. Gower and Werner's post-removal medical evidence is probative and thus must be considered, after carefully weighing the totality of the evidence, we conclude that the agency proved by preponderant evidence that the appellant's condition disqualifies him from his CBPO position, its recurrence cannot be ruled out, and the duties of the CPBO position are such that a recurrence would pose a reasonable probability of harm. Thus, we find that the appellant is physically unable to perform the duties of his position. [9]

The removal penalty does not exceed the tolerable limits of reasonableness.

¶20    We have recently observed that the *Douglas* factors do not apply in an adverse action based on inability to perform because of the nondisciplinary nature of the agency action. *Brown*, 121 M.S.P.R. 205, ¶ 18. The standard to be applied in such cases is whether the penalty of removal exceeded the "tolerable limits of reasonableness." *Id.* (citing *Marshall-Carter v. Department of Veterans Affairs*, 94 M.S.P.R. 518, ¶ 14 (2003), *aff'd*, 122 F. App'x 513 (Fed. Cir. 2005)). When, as here, an employee cannot perform the essential duties of his position, the Board must generally examine whether the agency has any vacant positions

the CBPO position. *Alvara v. Department of Homeland Security*, 121 M.S.P.R. 613, ¶¶ 5-15, 45-46 (2014). That holding does not affect the correct disposition in this case, as there is no claim of failure to accommodate a disability. Working unscheduled hours during an emergency or in the middle of the night is a requirement for the CPBO position, and the appellant's ability to comply with that requirement is properly considered in determining whether his removal for inability to perform was proper.

[9] In its petition for review, the agency contends that the Board must give deference to an agency's determination that an employee does not meet the fitness-for-duty standards of a position because "the [a]gency is in a better position than the [B]oard to determine whether medical evidence supports or disproves an employee's ability to properly perform the essential duties of his position." PFR File, Tab 1 at 14-15. In support of its position, the agency cites the Federal Circuit's decision in *Lachance v. Devall*, 178 F.3d 1246, 1251-52 (Fed. Cir. 1999), in which the court found that the Board must give deference to an agency's penalty determinations. *Id.* at 15-17. We are unaware of a Board or Federal Circuit decision holding that the Board must defer to an agency's determination of an employee's medical ability to perform the essential duties

within the employee's restrictions to which the employee could be assigned.  *See Brown*, [121 M.S.P.R. 205](#), ¶ 19.  The Board has recognized an exception to this general rule when the employee has refused to cooperate with the agency's attempts to accommodate the employee.  *Id.*

¶21        Here, the record shows that the agency offered the appellant the opportunity to apply for any available positions for which he might qualify, including outside of his current commuting area.  IAF, Tab 6 at 17.  The appellant rejected this offer.  *Id.* at 20.  Accordingly, the agency did explore the possibility of reassigning the appellant to another position, but he rebuffed the agency's effort.[10]  Under these circumstances, we find that the removal penalty does not exceed the tolerable limits of reasonableness.

## ORDER

¶22        This is the final decision of the Merit Systems Protection Board in this appeal.  Title 5 of the Code of Federal Regulations, section 1201.113(c) ([5 C.F.R. § 1201.113](#)(c)).

### NOTICE TO THE APPELLANT REGARDING YOUR FURTHER REVIEW RIGHTS

You have the right to request further review of this final decision.

Discrimination Claims:  Administrative Review

You may request review of this final decision on your discrimination claims by the Equal Employment Opportunity Commission (EEOC).  *See* Title 5

---

of his position.  The agency does not cite any such authority for that proposition in its petition for review.  *See* PFR File, Tab 1.

[10] Neither Dr. Skop nor Dr. Prunier expressed the view that the appellant was unable to perform the essential duties of the CBPO position on a permanent basis.  *See* HT at 26-27 (Dr. Skop); IAF, Tab 7 at 18-19 (Dr. Prunier).  However, Dr. Prunier observed that he saw no indication that the appellant had made any efforts to engage in anger or stress management therapy, as recommended by Dr. Skop.  HT at 181.

of the United States Code, section 7702(b)(1) (5 U.S.C. § 7702(b)(1)). If you submit your request by regular U.S. mail, the address of the EEOC is:

Office of Federal Operations
Equal Employment Opportunity Commission
P.O. Box 77960
Washington, D.C. 20013

If you submit your request via commercial delivery or by a method requiring a signature, it must be addressed to:

Office of Federal Operations
Equal Employment Opportunity Commission
131 M Street, NE
Suite 5SW12G
Washington, D.C. 20507

You should send your request to EEOC no later than 30 calendar days after your receipt of this order. If you have a representative in this case, and your representative receives this order before you do, then you must file with EEOC no later than 30 calendar days after receipt by your representative. If you choose to file, be very careful to file on time.

Discrimination and Other Claims:  Judicial Action

If you do not request EEOC to review this final decision on your discrimination claims, you may file a civil action against the agency on both your discrimination claims and your other claims in an appropriate United States district court. *See* 5 U.S.C. § 7703(b)(2). You must file your civil action with the district court no later than 30 calendar days after your receipt of this order. If you have a representative in this case, and your representative receives this order before you do, then you must file with the district court no later than 30 calendar days after receipt by your representative. If you choose to file, be very careful to file on time. If the action involves a claim of discrimination based on race, color, religion, sex, national origin, or a disabling condition, you may be entitled to representation by a court-appointed lawyer and to waiver of any requirement of

prepayment of fees, costs, or other security.  *See* 42 U.S.C. § 2000e5(f) and 29 U.S.C. § 794a.


FOR THE BOARD:


_____
William D. Spencer
Clerk of the Board
Washington, D.C.